IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| RAYMOND L. AMERSON, | ) | Civil Action No. 3:12-2448–TMC-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| CAROLYN W. COLVIN,[1] ACTING | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

Plaintiff filed an application for DIB on October 2, 2006, alleging disability since January 6, 2006. See Civil Action No. 3:09-cv-02857-HMH-JRM. Plaintiff's application was denied initially and on reconsideration, and he requested a hearing before an administrative law judge ("ALJ"). After a hearing held on March 19, 2009, at which Plaintiff (represented by counsel) appeared and testified, the ALJ issued a decision on June 23, 2009, denying benefits. A vocational expert ("VE") also testified at the hearing. The ALJ found that Plaintiff was not disabled within the meaning of the

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as Defendant in this lawsuit.

Act because, under the medical-vocational guidelines (also known as the "Grids") promulgated by the Commissioner, Plaintiff remains able to perform work found in the national economy. See generally 20 C.F.R., Part 404, Subpart P, Appendix 2.

The undersigned issued a Report and Recommendation on November 12, 2010 recommending that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g), and the case be remanded to the Commissioner for further administrative action. ECF No. 16. The undersigned noted the ALJ's credibility determination was not supported by substantial evidence in that it was based on an RFC determination which was not supported by substantial evidence and that it was unclear from the decision why the ALJ discounted Plaintiff's credibility. On December 7, 2010, the Honorable Henry M. Herlong, Jr., Senior United States District Judge, adopted the recommendation of the undersigned and the case was remanded to the Commissioner. ECF No. 20.

After remand, a hearing was held on June 6, 2011, at which Plaintiff and a VE appeared and testified. The ALJ denied Plaintiff's claims in a decision dated September 12, 2011, finding at step five of the sequential evaluation process[2] that Plaintiff was not disabled because work exists in the national economy which Plaintiff can perform.

Plaintiff was fifty-two years old at the time he was last insured for disability benefits. He has a twelfth grade education (without a high school diploma), with past relevant work as a general

---

[2] In evaluating whether a claimant is entitled to disability insurance benefits, the ALJ must follow the five-step sequential evaluation of disability set forth in the Social Security regulations. See 20 C.F.R. § 404.1520. The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. See id.

2

farmer. Tr. 98, 104, 106, 436-439.  Plaintiff alleges disability since January 6, 2006, due to arthritis, back pain, depression, and irritable bowel syndrome ("IBS"). Tr. 97, 110.

The ALJ found (Tr. 263-271):

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2006.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 6, 2006 through his date last insured of March 31, 2006 (20 CFR 404.1571 *et. seq.*)

3. Through the date last insured, the claimant had the following severe impairments: obesity, irritable bowel syndrome, and vertigo (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform simple, routine tasks at the light exertional level as defined in 20 CFR 404.1567(b) except for work requiring lifting or carrying of more than 20 pounds occasionally, lifting or carrying of 10 pounds or less more than frequently; no climbing, kneeling, crawling, or exposure to heights or dangerous machinery, or interaction with large crowds; or more than occasional stooping or crouching.  His work must have ready access to bathroom facilities in a temperature controlled environment, and must permit him to miss two days of work a month.  His limitations of simple, routine tasks and no interaction with large crowds are due to his pain and medication side effects and not due to any mental impairment.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on May 25, 1953 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

> 9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> 10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).
>
> 11. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 6, 2006, the alleged onset date, through March 31, 2006, the date last insured (20 CFR 404.1520(g)).

On June 25, 2012, the Appeals Council declined to assume jurisdiction, making the decision of the ALJ the final decision of the Commissioner. Tr. 243-246. Plaintiff filed this action on August 23, 2012.

## **STANDARD OF REVIEW**

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

**MEDICAL RECORD**

Between 2001 and 2005 (prior to Plaintiff's alleged disability onset date), Plaintiff was treated by family practitioners Dr. Sidney Griffin and Dr. Martin Carmichael and gastroenterologist Dr. Manver Razick for complaints related to IBS, gastrointestinal reflux, pernicious anemia (decreased red blood cells due to an inability to absorb vitamin B-12), sleep apnea, low back strains, body aches, hypertension, allergies, gout, fatigue, and depression. See Tr. 149-179, 183-191. Plaintiff underwent a colonoscopy on July 3, 2002, which Dr. Razick thought was indicated because Plaintiff complained of unexplained right upper quadrant pain and had hemoccult positive stool. Dr. Razick wrote that prior workup included an ultrasound and a HIDA scan (which tracks the flow of bile from the liver to the small intestine), both of which were negative. During the colonoscopy, internal hemorrhoids were found and Dr. Razick opined that Plaintiff's severe cramping, which was associated with loose stools, could be the result of spastic colitis. Plaintiff was given a prescription for Levbid and instructed to take Metamucil, adhere to a low fat diet, and avoid milk products. Tr. 154. On August 22, 2002, Dr. Razick opined that Plaintiff's right-sided cramping pain could be IBS. He discontinued Levbid as it caused Plaintiff dry mouth and resulted in only minimal improvement. Nulev was added and Fibercom was recommended. Tr. 153.

As noted above, Plaintiff's alleged onset of disability date is January 6, 2006. On February 15, 2006, Plaintiff complained of diarrhea for two weeks after he ate at a fast food restaurant which was also around the time he changed to generic Libax (medication to relieve abdominal spasms and cramping). He said his stomach gave him so much trouble he could not work any more, and reported that he continued to have joint pain. Dr. Carmichael changed Plaintiff's prescription to name brand Libax and recommended stool cultures, which came back negative. Tr. 183. On February 24, 2006,

Dr. Carmichael prescribed the antidepressant Zoloft in addition to Libax for Plaintiff's IBS. Tr. 183. On March 10, 2006, Plaintiff reported some sleepiness from his medication. Dr. Carmichael recommended that Plaintiff "start backing off" Libax. Tr. 182.

On March 23, 2006, Plaintiff complained of feeling dizzy and shaky after stopping Zoloft. Plaintiff had reduced his Libax as previously recommended, quit Zoloft on his own, and restarted Librax after he began having diarrhea again. Dr. Carmichael instructed Plaintiff to restart Zoloft and a reduced dose of Libax. He also noted that Plaintiff complained of muscle aches. Dr. Carmichael's examination revealed that Plaintiff had a normal gait, intact cranial nerves, intact motor and sensory functions, normal reflexes, clear lungs, regular heart rate and rhythm, no peripheral edema, and an intact neurovascular status. He diagnosed Plaintiff with IBS and vertigo, noting that a previous work-up for dizziness had been negative. He prescribed Antivert (medication for nausea and dizziness), administered a B-12 shot (for pernicious anemia), and referred Plaintiff to a rheumatologist for pain complaints. Tr. 182.

As noted above, Plaintiff's insured status expired on March 31, 2006. On April 17, 2006, Dr. Carmichael prescribed medication for Plaintiff's gout pain. On July 12, 2006, Plaintiff complained of giveaway knee pain and low and mid back pain. Dr. Carmichael's examination revealed that Plaintiff had popping sounds in his knees and muscle spasms in his back. Dr. Carmichael thought that Plaintiff's obesity contributed to his knee pain and noted that Plaintiff had strained his back. A B-12 shot was given, a muscle relaxant was prescribed, and Plaintiff was referred to an orthopaedist for his knees. Tr. 182.

6

On September 7, 2006, Plaintiff complained of joint pain in his arms and "staying in the bathroom all the time." Dr. Carmichael instructed Plaintiff to follow up with Dr. Patel for his arm pain and with Dr. Razick for his IBS. Tr. 181.

On October 6, 2006, Plaintiff complained of his blood pressure being too high, but Dr. Carmichael thought it was "not too high." Plaintiff also complained of muscle aches, numbness in his arms (which had been going on for "a while"), and memory problems. Dr. Carmichael thought that Plaintiff's complaints were somatic and related to depression. He referred Plaintiff to a neurologist to "make sure there [was] nothing else going on." Tr. 181.

On October 25, 2006, Plaintiff was examined by Dr. Ashley Kent, a neurologist. Plaintiff complained of right arm tingling and neck pain for the previous past two to three months, and a history of achy joints due to arthritis. Examination revealed that Plaintiff was morbidly obese, alert, oriented, and in no acute distress. Plaintiff had an intact gait; normal station and posture; intact cranial nerves; intact sensation; normal muscle bulk, tone, and strength; normal deep tendon reflexes, and normal fine motor skills. Dr. Kent thought that Plaintiff appeared depressed, but had intact recent and remote memory and normal attention, concentration, and speech. Plaintiff was diagnosed with worsening depression for which Wellbutrin was prescribed. It was noted that Plaintiff's non-compliance with his continuous positive airway pressure ("CPAP") machine for sleep apnea might be contributing to his memory loss and depression. Nerve studies of Plaintiff's legs and an EMG of his right arm were ordered. Tr. 232-236. These studies revealed mild polyneuropathy and mild right carpal tunnel syndrome. Tr. 231. On November 9, 2006, a sleep study revealed that Plaintiff had moderate obstructive sleep apnea correctable with a CPAP machine. Tr. 230.

On December 13, 2006, Plaintiff reported that his depression was a little better; his CPAP machine for sleep apnea was not working as well; his energy level varied; and he had continued pain in his back, feet, and legs as well as new pain in his neck. Dr. Kent's examination revealed that Plaintiff had intact gait; normal station and posture; intact cranial nerves; and normal muscle bulk, tone, and strength in his extremities. From a mental standpoint, Plaintiff appeared depressed, but was alert and fully oriented with intact recent and remote memory.  Tr. 227-229.

On March 14, 2007, a year after Plaintiff's insured status expired, Dr. Kent noted that Plaintiff was doing better depression-wise and complained of pain in his back and legs and weakness in his arms. Upon examination, Plaintiff was noted to be alert and oriented and had an intact gait; normal station and posture; normal speech; intact cranial nerves; normal muscle bulk, tone, and strength; and normal fine motor skills. Dr. Kent opined that Plaintiff was "disabled probably totally due to DM [diabetes mellitus], neuropathy, arthritis, depression, and cervical spondylosis." Tr. 224-226.

Plaintiff continued to seek treatment with Drs. Griffin and Carmichael through 2009.  Tr. 237-240. On July 25, 2007, Dr. Griffin wrote a letter to Plaintiff's counsel stating he had treated Plaintiff for over forty years; Plaintiff had a history of kidney stones, pernicious anemia, high blood pressure, and osteoarthritis; and Plaintiff had developed vertigo, bilateral leg neuropathy, reflux, and marked depression. He opined that Plaintiff's condition had "degenerated to the extent that he is now totally disabled." Tr. 211. On January 13, 2009, Dr. Griffin noted that Plaintiff had "right severe osteoarthritis and is totally disabled because of his disease processes."  Tr. 238.  On January 26,

2009, Dr. Kent saw Plaintiff again and opined that Plaintiff was "probably completely and totally disabled due [to] Depression, arthritis, and [obstructive sleep apnea]" Tr. 212-214.[3]

## HEARING TESTIMONY/REPORTS

In a report dated March 5, 2007, Plaintiff wrote that his daily activities included helping prepare breakfast; doing light housework including laundry, dishes, vacuuming, and taking out trash when he felt up to it; mowing the grass; going to the store; feeding and watering his animals (a dog, a cat, and four horses); watching television; going to doctor's appointments; and going to games to watch his daughter who was a cheerleader. Tr. 111-113. Plaintiff reported that he could prepare simple meals daily and went outside daily for short periods. Tr. 113-114. Plaintiff reported that he went to the grocery store, cleaners, pharmacy, and feed store about once a week. Tr. 114. He was also able to pay bills, count change, handle a savings account, and use checks or money orders. Plaintiff wrote that he rode horses and went camping once a year if at all, attended ball games two to three times a week, and went to "Saddle Club" monthly. Tr. 115. Plaintiff did not socialize as much as he used to due to his IBS. He reported he could walk 100 yards before needing to rest, pay attention for 30 to 45 minutes, and follow spoken instructions "ok" if they were simple and clear. He said he did not handle stress or change very well. Tr. 116-117.

At the hearing before the ALJ on March 19, 2009, Plaintiff testified that he had a driver's license and did not have any trouble driving. Tr. 21-22. He said that he was a farmer for most of his

---

[3]After this case was remanded to the Commissioner, Plaintiff submitted additional medical records. These are all dated well after Plaintiff's date last insured, with the earliest dated in March of 2009 (approximately three years after Plaintiff's date last insured). See Tr. 448-451, 453-558. These records include opinion evidence from treating and consultative sources. The ALJ considered this evidence and discounted it. See Tr. 268-269. Plaintiff has not challenged the ALJ's treatment of this evidence.

life. Plaintiff said he stopped working in 2005, but rented his land for farming. Tr. 22-23. He reported that he was 5 feet 8 ½ inches and weighed 235, down from 310 pounds. Tr. 24. Plaintiff stated that IBS caused him to "run to the bathroom" during or after meals, and he sometimes had accidents before he made it to the bathroom. Tr. 24. When this happened, he generally had to go to the bathroom two or three times in a row over a two to three hour period and had extreme pain. Tr. 27. Plaintiff said he occasionally went out to eat at restaurants. Tr. 25.

Plaintiff testified that he had become really depressed and took medication for depression. Tr. 25-26. Although the medication he took helped his stomach problems, it did not entirely relieve his ailment. Tr. 27. Plaintiff reported that his stomach problems began before 2006, but became "extremely bad" by early 2006. Tr. 28. He said he had arthritis in his low back, hands, and legs, for which he took prescription Tylenol-based medications which sometimes helped him. Tr. 28-29. Plaintiff said he could lift five or ten pounds without much difficulty, but began having problems lifting over fifteen pounds. He could hold a pen to write, but had to rest due to pain. Tr. 29-30. Plaintiff could stand for fifteen to thirty minutes at a time, but could not stand for long periods due to back pain. Tr. 30. He said he could sit for thirty minutes before having to move around and had difficulty sleeping due to pain. Tr. 30-31. Although he could bathe and dress himself, Plaintiff reported trouble with socks and shoes due to hand pain. Tr. 31.

Plaintiff said that he had a "real bad choking problem at one time," but it was relieved by taking Nexium. Tr. 32. His blood pressure, while high sometimes, had been "fairly good." Tr. 33. Plaintiff reported he had taken Wellbutrin for depression since 2006. Tr. 33. He had stopped going to church over the previous three years due to his "stomach and stuff." Tr. 34. Plaintiff said he cut the grass on a riding lawnmower during the cool part of the day, and could not do the entire two acres

in one day. He helped wash clothes and vacuum the house a little bit at a time, cooked simple meals, and went to the gas station to get gas or sit around with friends in order to get out of the house. Tr. 35-36.

At the hearing on June 6, 2011, Plaintiff testified that due to IBS, he would need to go to the bathroom about every time he ate, and sometimes between meals. Tr. 292. Plaintiff reported that he sometimes cannot make it to the bathroom in time (Tr. 293) which has caused him to go out less, particularly with friends (Tr. 293). He said that he avoids going out in public. Tr. 293. He reported that he went with his wife shopping at the mall and would wait for her on a bench outside. Tr. 306. He stated that this condition started before 2006, but has gotten worse over the years. Tr. 293. Plaintiff testified that medication did not help his condition, and that no doctor had offered him a surgical solution. Tr. 295-296. Plaintiff testified that anti-depressants and anti-anxiety medications helped him somewhat, but that he still had problems with depression and anxiety attacks. Tr. 294.

Plaintiff was asked to clarify his education background, and he reported going to school through twelfth grade, but not passing seventh or twelfth grade, and not getting a diploma. Tr. 309. He stated that it had to be very simple reading for him to understand it, and he did not know any "fancy words." Tr. 309. He testified that he could write some, but was not very good with writing or spelling. Tr. 309.

## **DISCUSSION**

Plaintiff alleges the ALJ erred by (1) failing to ascertain whether he could read; (2) failing to assign enough importance to his depression; (3) failing to give controlling weight to the opinion of his treating physician (Dr. Griffin); and (4) improperly finding he could perform work where he

needed accommodations.[4] The Commissioner contends that substantial evidence supports the Commissioner's final decision that Plaintiff was not disabled within the meaning of the Social Security Act. In particular, the Commissioner argues that the ALJ properly: (1) assessed Plaintiff's level of education and ability to communicate in English, (2) evaluated the opinion of and evidence from Dr. Griffin; (3) evaluated Plaintiff's depression, and (4) relied on VE testimony accounting for Plaintiff's limitations requiring ready access to a bathroom and the ability to miss two days of work per month.

> A.    Literacy/Education

Plaintiff alleges that the ALJ failed to ascertain at the hearings whether he could read. He argues that he is functionally illiterate, brings his wife with him to read for him, and a Slosson test administered in August 2012 showed he was reading at a fifth grade level. The Commissioner contends that the ALJ properly assessed Plaintiff's level of education and ability to communicate in English.

Plaintiff may be attempting to argue that he should be found disabled based on Medical-Vocational Rule 202.09. This rule provides that someone who is closely approaching advanced age, who is illiterate or unable to communicate in English, and who has unskilled past

---

[4] Plaintiff also asserts that "[the] ALJ has twice failed to note the severity of claimant's physical and mental conditions. Along with claimant's low reading level, these conditions represent a combination of impairments that render him unable to do any of his past relevant work." Plaintiff's brief, ECF No. 8 at 3. It is unclear what conditions the ALJ allegedly failed to properly consider (other than the allegation concerning depression, which is discussed below). Review of the ALJ's decision reveals that the ALJ properly considered Plaintiff's combination of impairments by discussing all of Plaintiff's severe and non-severe impairments (Tr. 264-265); finding that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listing (Tr. 266); limiting Plaintiff to light work with additional restrictions based on his impairments, and considering Plaintiff's combination of impairments in his hypothetical to the VE (see Tr. 321-322).

relevant work or no past relevant work should be found to be disabled. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.09. Here, Plaintiff fails to establish that he should be found disabled under § 202.09. He has not shown that he is illiterate (as defined below) or that he was unable to communicate in English. Plaintiff previously testified that he can read and write "as long as it's real simple stuff." Tr. 22. He also testified that he went to school through the twelfth grade, although he did not pass the seventh or twelfth grade. Thus, his own testimony does not support a finding that he is illiterate.[5]  Plaintiff has not provided a definition of what constitutes functional literacy. The only evidence he has presented to argue that he is "functionally illiterate" is the results of the Slosson Test administered in August 2012. Even if this evidence is admissible,[6] it does not establish that he is illiterate as Plaintiff asserts that the test results show he read as at a fifth grade level.

Under the regulations, a person is "illiterate" if he "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name," and "[g]enerally, an illiterate person has had little to no formal schooling." 20 C.F.R. § 404.1564(b)(1). A "marginal education" is defined as "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs," generally "formal schooling at a sixth grade level or less." 20 C.F.R. § 404.1564(b)(2).  Thus, based on Plaintiff's testimony, as well as his assertion that the Slosson test results demonstrate he reads at a fifth grade level, his capabilities exceed a finding

---

[5]Additionally, the ALJ found that Plaintiff's past work was skilled work (see Tr. 270) such that he has not shown that he had unskilled past relevant work (or no past relevant work).

[6]There is no indication that the Slosson test, attached as an exhibit to Plaintiff's Brief, is part of the administrative record before the Commissioner. "Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the [Commissioner's] decision is supported by substantial evidence." Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir. 1972); see also 42 U.S.C. § 405(g).

that he is "illiterate" and qualify as having at least a marginal education (if not a high school education as found by the ALJ). See 20 C.F.R. § 404.1564(b). Plaintiff stated in his disability report that he completed the twelfth grade and did not attend any special education classes (Tr. 104). Even if Plaintiff's education was found to be at the marginal level rather than a high school education, Medical-Vocational Rule 202.10 applied as a relevant framework would direct a finding of "not disabled," and would not have been materially different from the framework from Rule 202.14, which the ALJ used (see Tr. 271). See 20 C.F.R. Part 404, Subpt. P, App. 2, §§ 202.10 and 202.14.

B.     Depression

Plaintiff alleges that the ALJ failed to "assign enough importance to the claimant's depression, for which he was assigned medication." ECF No. 8 at 2. He asserts that when a claimant alleges a mental condition, the ALJ is supposed to treat it seriously and follow the techniques set forth in 20 C.F.R. § 404.1520a. The Commissioner contends that the ALJ properly evaluated Plaintiff's depression, specifically discussing this impairment and explaining the process by which he evaluated it (the special technique prescribed in § 404.1520a).

Here, the ALJ's consideration of Plaintiff's depression and finding that Plaintiff's depression was a non-severe impairment is supported by substantial evidence and correct under controlling law. The ALJ found, pursuant to 20 C.F.R. § 404.1520a, that Plaintiff's mental impairment was non-severe. He specifically found that through Plaintiff's last date insured (March 31, 2006), Plaintiff had only mild difficulties in activities of daily living; social functioning; and concentration, persistence, or pace, and had no episodes of decompensation of extended duration.  Tr. 265. If a claimant's limitations in the first three areas are rated as "none" or "mild" and the claimant's

14

limitations in the fourth area are rated as "none," then the claimant's mental impairment will generally be found to not be severe. See 20 C.F.R. § 404.1520a(d)(1).

Plaintiff cites Waters v. Astrue, 495 F.Supp.2d 512 (D. Md. 2007) as supportive of his argument that the ALJ failed to properly evaluate his depression. In Waters, the district judge found that there was evidence before the ALJ regarding the claimant's allegation of depression, but it was not properly discussed by the ALJ as the ALJ never discussed depression in his decision, and the ALJ failed to adequately document whether he followed the special technique set forth in § 404.1520a. Id. at 515-516. In the present case, however, the ALJ noted that Plaintiff was diagnosed with depression in July 2004, had some stress in his life, and was prescribed Zoloft. He further stated that through Plaintiff's date last insured no significant medical signs related to Plaintiff's depression were noted. As discussed above, the ALJ also cited the applicable law (including § 404.1520a), and applied the special technique. See Tr. 265-266.

C.     Treating Physician

Plaintiff appears to allege that the ALJ erred in failing to give the July 2007 opinion of his treating physician, Dr. Griffin, controlling weight. He asserts that there was plenty of evidence in the record to support Dr. Griffin's statement that he treated Plaintiff for years and that Plaintiff was unable to work. The Commissioner contends that the ALJ properly evaluated the opinion of and evidence from Dr. Griffin.[7]

---

[7]The Commissioner also contends that the ALJ discussed the later evidence from Dr. Griffin and properly discounted it. The ALJ discounted Dr. Griffin's January 2009 opinion (that Plaintiff had "right severe osteoarthritis and is totally disabled because of his disease process" - Tr. 238) because it was conclusory and too remote in time to be reasonably related back to Plaintiff's date last insured (March 31, 2006), and he discounted Dr. Griffin's March 2011 opinion (that Plaintiff became totally disabled in 2006 -Tr. 476-477) because it was not consistent with the medical records, Dr. Griffin's
(continued...)

15

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

In July 2007, Dr. Griffin opined that Plaintiff's condition had "degenerated to the extent that [Plaintiff] is now totally disabled." He stated that Plaintiff "is now totally disabled and do [sic] not

---

[7](...continued)

statement clearly referred to conditions occurring after Plaintiff's date last insured, it was inconsistent with Dr. Griffin's July 2007 statement that Plaintiff's conditions degenerated to the extent that he was now (July 2007) totally disabled, and it could not reasonably be related back to the period through March 21, 2006. Tr. 268. Plaintiff has not challenged the ALJ's treatment of these opinions.

feel that [Plaintiff] can be gainfully employed in the foreseeable future." Dr. Griffin noted that Plaintiff had a long history of kidney stones, pernicious anemia, high blood pressure and osteoarthritis and had developed vertigo, bilateral leg neuropathy, gastroesophageal reflux and was markedly depressed "at the present time." Tr. 211. The ALJ's decision to discount the July 2007 opinion of Dr. Griffin is supported by substantial evidence and correct under controlling law. He gave specific reasons for giving Dr. Griffin's 2007 opinion little weight. Tr. 268. The ALJ noted that Dr. Griffin's statement of disability was rendered over a year after Plaintiff's date last insured and Dr. Griffin wrote that Plaintiff's condition deteriorated such that Plaintiff was "now" disabled, indicating the assessment applied to the 2007 time frame. Based on this, the ALJ found the opinion could not be reasonably related back to the period at issue. Id. The ALJ also discounted Dr. Griffin's opinion because it was inconsistent with his progress notes for the period through March 31, 2006, and inconsistent with other medical records for that time period. Tr. 268; see Tr. 149, 153-165, 182-191. The ALJ also discounted the opinion as conclusory and pertaining to an issue reserved to the Commissioner. Tr. 268. Such an opinion pertains to an administrative finding reserved to the Commissioner such that it is not entitled to any special weight or significance. See 20 C.F.R. § 404.1527; Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027 (10th Cir. 1994); see also Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)(statements that a claimant could not be gainfully employed are not medical opinions, but opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner); King v. Heckler, 742 F.2d 968 (6th Cir. 1984); Montijo v. Secretary of Health & Human Servs., 729 F.2d 599, 601 (9th Cir.1984).

D.     Hypothetical to the VE/Accommodations

Plaintiff alleges that the ALJ erred by relying upon accommodations the ALJ and VE assumed an employer would make in order to conclude that he could perform light, unskilled labor. He argues:

> This type of job modification is beyond what a VE is supposed to consider when deciding whether a claimant can do certain types of jobs. In assuming that an employer would allow ready access to a bathroom and permit the claimant to miss two days per month, the VE was making an irrelevant assumption. The administrative court is supposed to reject testimony which assumes an employer will make accommodations for a claimant.

ECF No. 8 at 2. The Commissioner contends that the ALJ properly relied on VE testimony accounting for limitations requiring ready access to a bathroom and the ability to miss two days of work per month.

In order for a VE's opinion to be relevant or helpful, it must be based upon a consideration of all the other evidence on the record and must be in response to hypothetical questions which fairly set out all of the plaintiff's impairments. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). The questions, however, need only reflect those impairments that are supported by the record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

The ALJ properly found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform based on testimony from the VE. At the second hearing, the ALJ asked the VE to consider a claimant restricted to light exertion who could not climb, kneel, or crawl; could occasionally stoop and crouch; needed to avoid any heights or dangerous machinery; needed ready access to bathroom facilities; could only engage in routine, simple work and avoid large crowds; would need to be in an indoor, temperature-controlled environment; and would miss work up to two days a month, mainly due to problems with IBS. Tr. 321-322. This hypothetical

included all the restrictions the ALJ included in his RFC finding. See Tr. 266. Based on this hypothetical, the VE indicated that Plaintiff would be able to perform other work that existed in significant numbers, such as a routing clerk, office helper, or garment folder. Tr. 322-323.

Plaintiff argues that the VE made an irrelevant assumption in assuming the employer would permit the claimant to miss two days of work per month and would allow ready access to the bathroom as this amounted to an assumption that an employer will make accommodations for a claimant. He cites to Eback v. Chater, 94 F.3d 410, 412 (8th Cir. 1996), to support his argument that the ALJ is supposed to reject testimony that assumes an employer will make accommodations for a claimant. In Eback, the claimant's impairments required her to use a nebulizer from 7:00 a.m. to 8 a.m., from 2 p.m. to 3 p.m., and twice more in the evening, resulting in a continuous hour-long need to use the nebulizer at least once during the workday (if not more). Id. at 411-412. The VE in Eback specifically described allowing the nebulizer usage as an "accommodation" which was likely to be reasonably made under the Americans with Disabilities Act ("ADA"), but noted that his opinion as to employability would change if the employer were not willing to make accommodations. Id. at 412. The Eighth Circuit found the ALJ's denial of benefits was faulty for a number of reasons, the most significant of which was the incorrect assumption that the number of jobs available to the claimant must be based on an employer's willingness to make accommodations under the ADA. Id.

In the present case, however, neither the ALJ nor the VE referred to either ready access to a bathroom or two absences per month as an accommodation. See Tr. 321-324. Plaintiff did not challenge the VE's testimony that Plaintiff could perform the jobs identified by taking into account a need for ready access to a bathroom and missing up to two days of work a month. See Tr. 325-327. Plaintiff's counsel cross-examined the VE, asking whether the requirement to be away from the

workstation or away from doing productive work in an unpredictable fashion for 45-60 minutes per day (not regular bathroom breaks or lunch break) would preclude the jobs the VE identified. Tr. 326. The VE testified this would represent an accommodation. Tr. 326-327. The ALJ was not required to include the additional limitations proposed by Plaintiff's counsel because the ALJ did not find these limitations to be credible and/or supported by the record. See Lee v. Sullivan, 945 F.2d 689, 698-94 (4th Cir. 1991)(noting that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record"); Chrupcala, supra. There was no testimony in this case that the need for two absences in a month was an accommodation. To the contrary, the VE specifically explained that the limit for absences in unskilled work would be two or fewer days per month (Tr. 324), indicating that this was something employers conventionally accept (and that three or more absences a month would be a problem).

## CONCLUSION

Based on the foregoing, it is RECOMMENDED that the Commissioner's decision be **AFFIRMED**.

Joseph R. McCrorey
United States Magistrate Judge

September 4, 2013
Columbia, South Carolina

20